20-3298 United States of America v. Shiheem Amos, if I'm pronouncing that right, and Ms. Horn. Take your time, and whenever you're ready, we'll begin. Thank you, Your Honors. May it please the Court, my name is Abigail Horn, and I represent the appellant Shiheem Amos. I'd like to reserve three minutes for a rebuttal, please. Granted. Thank you. This case raises two issues. First, Mr. Amos was subjected to an unconstitutional Terry stop, and second, the district court erroneously applied the crime of violence enhancement to the guidelines based on a prior conviction for Pennsylvania aggravated assault as a felony of the second degree. You've received our letter. We're not going to discuss A3 today, but we're happy to discuss all the other aspects that relate to that, and the Jenkins panel will decide the A3 issue. Yes, and I appreciate the courtesy of the heads up. Thank you. I'd like to begin with the motion, please. The issue in this case is the moment of seizure. The government does not argue that there was reasonable suspicion to stop Mr. Amos before he futilely attempted to flee. Therefore, the question is, was there a seizure pre-flight? But there was reasonable suspicion, wasn't there? Judge Fuentes, there was reasonable suspicion after Mr. Amos attempted to flee, but the reasonable suspicion analysis depends on what the police knew at the moment of seizure. And if Mr. Amos was seized prior to flight, then there was no reasonable suspicion because what the police had at that point was an anonymous radio call of a male assaulting a female on the highway, which does not amount to reasonable suspicion. So this ultimately comes down to whether he was apprehended when he momentarily paused or whether the apprehension doesn't come until later. So there's language in Valentine about momentary compliance. You want to say that's dictum, you know, but we use language like that in Smith, and Smith seems dispositive here. Two steps towards the car isn't enough. So isn't that factually analogous and isn't the momentary compliance language on point? We agree that Smith is not helpful for us, but I think the better case that's more on point is Brown. And what is significant here and why this case is distinguishable from Smith is that Mr. Amos continued walking towards the uniformed police officers who were obviously targeting him in the alleyway. He then stopped and raised his hands on command. One Mississippi. It's brief, but he did stop and he did comply and raise his hands. That didn't happen in Smith, where there were two steps towards the police before Smith took off. In Brown, significantly, that gentleman submitted by either placing his hands on the police car or, as this court explained, even if he began to make that motion and didn't complete it. But Smith read Brown narrowly and cabined it. Smith focused on Brown having submitted by following the offer to stay put, not just by starting to move his hands. So we can't read Brown as broadly as maybe Brown on its own would suggest. Well, I disagree, and I also think that even if we were reading other aspects of Brown into the analysis, we have other aspects of Mr. Amos's behavior here, namely that he walked directly towards Officer Lamos, who cut him off at the mouth of the alleyway and advanced on him. What do we make of the fact that he did stop? He raised his hands, approached the officer, and at one point just turned around and ran away. Well, I think that's the key question in the case, Judge Fuentes, is whether he submitted to the officer at that motion when he did stop and did raise his hands. Halfway, raising his hands halfway. You know, Judge Pupis, I've been puzzling with this. I don't know what raising hands halfway is here. Here I'm raising my hands to my shoulders. It's actually a little uncomfortable. It's going to untuck my shirt if I raise them above my head. I'm not sure what that means. Or this. It's not this. You know, I think we don't know whether the angle of the hands was horizontal or vertical. We don't have that from the record. This isn't a case with a dash cam or a body cam. The idea that he stopped and he was told to raise his hands, he raised his hands. Suddenly, he turned around and ran away. Is that not sufficient for reasonable suspicion? Well, the crucial thing is, was that a submission? Because if flight happens after the moment of seizure, then this Court can consider it. As the Supreme Court told us in J.L. and Terry, and as this Court said in many cases, Brown and Lowe and Coggins, things that happen after the moment of submission can't amount to reasonable suspicion. Right. But if he wasn't seized under Hidari D., you lose. So it all depends on whether he submitted and thus was seized. Exactly. We concede, you know, Hidari D., we're not making an argument about reasonable suspicion after flight. Right. Okay. Is there anything other than Brown that you cite Coggins and Lowe, but are either of them really on point? Yes, Your Honor. I think Coggins is helpful. In that case, we know that the defendant sat, and the language of the opinion is that he fled soon thereafter. So this is a brief sitting before taking off. And, again, the flight after the moment of submission is irrelevant. The way the Court read that was he complied by sitting back down. It's not just he started to move toward sitting and then ran away. Right. Here, he didn't fully submit, raise his hands all the way. You know, we know from Smith that even putting your, you know, being told to put your hands on the car, if you put your hands on the car, that's enough. But, you know, here he didn't sit all the way down or take a complete action like that. Well, I disagree, Your Honor. He did stop. And that, as we know from Lowe, is the crucial fact. In Lowe, the defendant actually disobeyed commands to show his hands and stepped backwards towards a fence. And this Court still found. We would have to reject the momentary compliance language to take that one. Well, I think this Court can find that it satisfied, just as it was satisfied in Brown, where the defendant either placed his hands on the car or merely began that motion. And the Court said that that was more than momentary compliance in Brown. I can follow you. He was told to stop, and he did stop. But very quickly thereafter, he turned and ran. Is that not correct? That's exactly the question, whether that stop was sufficient. And it's our position that it was sufficient. But I understand that he did stop, hands up, and then he must have said, uh-oh, turned around and ran away, back the other way. And, of course, that's when a gun was discovered shortly thereafter. Yes, those are the facts of the case. All right. I do want to make sure we have time to discuss the other aspects of crime of violence. The first thing I want to know is, are you suggesting there's any distinction between A3 and A5? Any reason why the Jenkins panel holding on A3 won't also control A5? No. Okay. So then we have to focus on A7 here. And what do you make of the tear gas provision? You say it's silent on mens rea. Do we fill it in with recklessness? But, you know, you cite Mayfield. But this is a very different crime from a crime of prison guards having sex with inmates, where sex itself, it's the knowledge someone's an inmate that makes it culpable. Whereas here, using noxious gas against someone seems to require targeting that person. So shouldn't we apply Borden and that whole understanding of use from Borden? This Court should not. This is an easy case to find that the mens rea for subsection A7 is recklessness. The text is silent. Pennsylvania regularly applies section 302C as a default rule. The model jury instructions say this is a crime of recklessness. Other subsections in the same statute say intentionally, for example, A4, knowing or intentionally causes bodily injury with a deadly weapon. What the government is arguing in terms of Borden is that you can take two words out of a much longer statute. It happens to be the ACCA, which is a little bit confusing. But it could be any statute. And say that those two words, uses and against, mean the same thing under Pennsylvania law. Okay. Well, you know, Pennsylvania law tells us the instructions aren't conclusive. They're just a guide. That's especially so because no state court has parsed this. So we don't treat that as dispositive. Isn't all the surrounding stuff about aggravated assault requiring intent, isn't that what we should rely on here? So the fact that many other subsections of aggravated assault say intent is crucial context to show that if the General Assembly wanted this to be a crime of intent, they would have said so. And this court did a full takedown of section 302 in Cabeda. It found that Pennsylvania, almost as a knee-jerk reaction, goes to section 302, the default statute, in IVSI, in aggravated indecent assault, in bribery, in the institutional sexual assault statute that Your Honor mentioned. I believe Judge Jordan collected, you know, about a half a dozen cases that are analogous where the Pennsylvania Supreme Court uses the default. That's the intent of the General Assembly here. And that makes sense with noxious gas, which we know by definition injures when dispersed in the atmosphere. And so what the government is saying is that the General Assembly, his 302 should be overruled and that people who merely recklessly expose first responders or police officers to noxious gas should get a pass for having a merely reckless intent. That's not what Pennsylvania intended here. If I could explain why this is a possible offensive conviction. I'm sorry, say again. Why this is an offensive conviction. Why A7 is a possible offensive conviction here? Yes. Okay. And the court can get there in two ways. The first is government waiver and the second is the merits of the Shepard document. As to waiver, the government affirmatively and repeatedly said over the better course of a year that the offensive conviction was A3 through A7. Doesn't A7 incorporate crimes of violence? A7 is not a crime of violence under Borden because it can be committed recklessly. Well, but Borden's treatment of the word use seems to cut the other way. So that was what I was saying, Judge Bibas, before is that the government is taking two words from a longer section that apply to a different definition, violent felony with a different purpose, to harshly punish someone who would pick up a gun and point the trigger. They're also relying on a plurality. There's four votes for that interpretation and four votes that against means who it's making contact with, which is the one that logically makes sense here. It's making contact with a member of the enumerated class. There's another statute where you make contact with someone involved in a labor dispute. I think that's 08. So Borden is not on point here, even if those four votes were a majority, which they're not. So I was trying to make the point about the government's waiver. The government responds that the court can affirm on any grounds. Of course, the full sentence is the court can affirm on any grounds not waived. This court said it in the Snapple case, in TD Bank. There's also authority in the ACA line of cases from Johnson 2010 and from Brown. Also, it's very important that the court recognize that the district court found the offensive conviction was A3 through A7, and there's a serious thumb on the scale in favor of the district court's finding in this respect. Often that line of cases will hurt us, but here it's the opposite. As long as the district court's interpretation is merely plausible, it controls, and it is plausible here, given the language of the written guilty plea colloquy that says I, Shaheem Amos, am charged with aggravated assault generally. The court did conclude that he was subject to a crime of violence. Yes, Judge Pointis, that's we challenged that conclusion here, that that's incorrect because he was subject because a possible offensive conviction under the categorical approach was A7, and that's a crime of recklessness. You ask us to remand with a closed record, but looks like on the record it's pretty clear that A7 didn't apply. What makes you think that it could, given the record? So the district court found that A7 did apply. It was a possible offensive conviction. This court can affirm that holding and should, either on the argument that the government waived the contrary argument by intentionally and affirmatively taking this position in district court from the time of the PSR through the sentencing memo to the sentencing hearing itself throughout. As I said, for the better course of the year, the government is arguing A7 is in play, but it's not a crime of violence. Now they say, oh, well, maybe we have a problem there, so now we want to say A7 isn't in play. That's an intentional waiver by the government, and so it can't be undone at this point. And then the district court agreed with that. A7 is in play under Shepard's. That's a plausible interpretation of the Shepard document. And as this court said in Bentley, even if there's another interpretation of the Shepard documents that's more plausible, you still go with the district court. The thumb on the scale is for the district court. The district court said at Appendix 243, the Shepard documents don't get us all the way home. We have A3 through A7 in play here. Let's use the categorical approach, which is the least of these. And you say he could be subject to A7. Yes, he could. And A7 specifically involves what? Crimes of violence? Tear gas. Tear gas, which can be committed recklessly. If somebody, you know, throws a tear gas canister against the wall and it exposes a police officer, that person would be guilty under Pennsylvania law. Using it against a person. All right. We'll get you back on rebuttal. Thank you, Your Honor. Mr. Zelzmer. Thank you. Good morning, Your Honor. May it please the Court, Robert Zelzmer on behalf of the government. With respect to the first issue concerning the search, there was no seizure here. The facts are very clear. There was one officer who testified, and the Court found him credible. This was Officer Lemos. And what he said at page 89 of the appendix, referring to Mr. Amos, he said, quote, what he did, he didn't put them all the way up. He placed them kind of like halfway point, and that's when he took off. And then page 91, the question and answer, you just ask the individual to stop and place his hands up. A question, and he did. Yes. For how long? Maybe a second. Okay. And then he did what? Answer, took off on foot. So if one wants to demonstrate this, and I am not an actor, raise hands halfway, one second, bolt. If that's a submission to authority, then we've pretty much written out the Hidari D rule, that there has to be a submission to authority in order for there to be a seizure. A gun was found. He had a gun in possession. He had a gun in his possession, and then when he took off, he was tackled very quickly by the other officer who ran after him. Both officers got out of the car. He didn't get very far. He got several steps and was tackled. He resisted. While he was struggling with the officers, a gun fell out, I think of his sweatshirt, and fell onto the pavement and was recovered. And so that was the seizure. There was no seizure until the moment at which he was apprehended, and the gun was recovered after it had fallen from his person. So there are other issues that were presented here. Was there reasonable suspicion to even ask him to stop? I think there was. Was this even a show of authority? The district court said no. This wasn't to just say, please stop and raise your hands, without displaying a weapon, without forcing him to do that. The district court said that wasn't even a show of authority. But we're not resting on this because this is such a simple, straightforward case to say that he did not submit to any show of authority. He hesitated for one second, assessed the circumstance, and ran. Smith, the gentleman, took two steps toward the car. I think Smith, he actually gave identifying information, which takes more than a second, and took two steps toward the car and then ran. Valentine, the man gave his name, said, who me, and paused for a second. This court called it momentary compliance, and he ran. He didn't run. He ran toward the officer in Valentine. But those cases are controlling here. Okay. In Brown, we suggested that if Brown had just moved his hands toward the top of the squad car, that might have been more than momentary. Wouldn't that rule favor Amos? Well, Brown, the gentleman, did stop and then turn toward the car and went to place his hands on the car. And if I recall the facts correctly, it was when the officers then went to pat him down because he was in a stationary position that he then struggled and the gun was recovered. So a lot more happened in Brown than here. Again, Your Honor, one second, raising your hands halfway and running is not a submission to a show of authority. If I may turn to the crime of violence issue, Your Honor, I appreciate my friend Ms. Horn's statement that A3 and A5 are basically the same. So today we'll talk about A7. Okay. Whatever Jenkins holds on A3 will apply to A5. The relevant first eight, ten words of the phrase are the same. Right. Okay. Let's go on to A7. So two things with A7. One is he wasn't charged with A7, and so that makes it pretty straightforward. But second, A7 does qualify as a crime of violence if he was charged with it. Addressing the first point that he wasn't charged with it, the Shepard document here is plain as day. We are in a remarkable situation here where the defense is arguing that he should be absolved of the crime of violence he committed because A7 exists in the second degree aggravated assault provision. And yet the Shepard document in the charging information lists subsections one through six. He wasn't charged with seven. Now, when we're dealing with a categorical approach, we are often, as Justice Thomas recently wrote in his dissent in Taylor, we are often in fantasy land. That's the term that Justice Taylor appropriately used. Well, we're in a new territory of fantasy land here. It's fantastical enough that we're in a case in which this gentleman, Mr. Amos, never had anything to do with noxious gas or electric incapacitation devices or what it talks about in A7. There's no sense in the record that he's ever even seen such a thing. He was convicted of aggravated assault because he assaulted a prison guard. He kicked him and then struggled with him. That's what it was about. It's an A3. It's an assault on an officer. So, yes, I agree that if it was a general charge of A3 through A7, we would have to be here talking about A7, ridiculous as that is. That's what the categorical approach, that's where it takes us. But it's even more ridiculous if you're talking about A7 in the case in which the person was not charged with A7. Now, they say that it's a waiver, that the government, it's true, at the hearing said it could have been any of the provisions, which were A3 or A7. But the reason the government said that at that time is that no one was focused on A7 at all. The argument that was being made by the defense at that time, to which the government was specifically responding, focused on A6. The argument that the defense was making was that A6, which is attempting by physical menace to put someone in fear of immediate serious bodily injury, is not a crime of violence. They've given that up, correctly so, because that plainly is a threat of physical force that qualifies as a crime of violence. But that's the argument that the government was responding to, and no one was focused on A7. Nobody was saying anything at this sentencing about noxious gas or incapacitation devices. Okay. So, you know, you've got an argument. Maybe you shouldn't have made this concession, but it doesn't look like you made this concession. Let's say we have to get to the merits of the A7 argument. Sure. How do we understand this? Do we look to the jury instructions and the default recklessness provision? I mean, Pennsylvania has a default provision. That's ordinarily where you go. Well, I don't know if ordinarily is quite fair, Your Honor. It's certainly something we need to consult to look at the jury instructions. No one's actually found an instance of a prosecution under A7, so we don't have a lot to work with here in terms of how the state charges it and what a state judge would actually instruct the jury, despite what this advisory corporation has suggested in publishing these proposed instructions. But we do have the very clear language of the statute. That's where this has to begin. As I know both Your Honors here and Judge Nygaard have written many times, we need to start with the statutory language. And the statutory language is, uses tear or noxious gas or uses an electric or electronic incapacitation device against any officer, employee, or other person. So Ms. Horne suggests, well, this can happen recklessly where somebody throws a tear gas canister against a wall, and I guess an officer happens to walk by and be affected by it. This would be very strange statutory language to address that situation. What would be normal to say is, one uses tear gas and it affects an officer. One would then question, why does the state legislature only care about officers? Why don't they care about anybody else who happens to be walking by at the time? The answer is very clear. The legislature, in many parts of this aggravated assault statute, is focused on assaults against public officers. That's what this is about. That's what nearly all of second-degree aggravated assault is about. And, in fact, it's the way in which it expands beyond aggravated assault that's in the Model Penal Code that this is otherwise based on. And so this is a provision specifically targeting those who would use noxious gas targeting an officer or an electric incapacitation device. That wasn't involved in this case at all? Not that I do with this case. And, you know, this is my job. We spend every day focusing on these crazy hypothetical situations. I was curious of what the significance of it is in this particular case. None, except that the Supreme Court mandates that we follow this categorical approach in which we have to ignore the real world and ignore what Mr. Amos has actually done in his life and instead look at whether some hypothetical other person could violate this same statute and do it in a completely different way than he did and in a nonviolent way. It's not just me complaining here. Many judges have written more eloquently than I'm saying it here as to just how strange all this is. But this is where we are in having to apply the categorical approach. But it's particularly bizarre here, as I said, Your Honor, because Mr. Amos has never in his life been charged with A7. And except for this one statement by the government at the sentencing hearing, we wouldn't even be talking about it. It's also very helpful. So not only is the statutory language pretty clear in that it's focused on targeted attacks against officers, but we have the Borden decision, which is very helpful. Ms. Warren says it's a plurality decision, but it's settled that it is the opinion of the Supreme Court that an offense that can be committed recklessly cannot qualify as a crime of violence. And they find that in the language defining crime of violence, which says it has to be the use of physical force against the person of another. Does that have to do with the mens rea element? Exactly, Your Honor. But the Supreme Court finds that mens rea element in the language of what we call the elements clause that shows up in every definition of a crime of violence, which says a crime of violence is the use of physical force  That's the definition of a crime of violence. And the Supreme Court says that speaks to intentional conduct. That excludes reckless conduct, because the person who acts recklessly is not using force against someone. He's not targeting someone. Now, I can complain about this whole categorical approach that we even have to use it, but that's a very clearly reasonable interpretation of the words uses against, which is the exact same language we see in A7. Uses noxious gas against an officer. This is talking about intentional conduct and not reckless conduct. So the plain statutory language tells us that A7 qualifies. Turns out, again, Mr. Amos was not charged with it. He was charged with A3 through A6. And this Court's decision in Jenkins should resolve it. This Court, in fact, is several times already in not-precedential decisions, has held, without any dissent, that A3 qualifies as a crime of violence. And so I'll have the privilege of arguing this again on Wednesday in the Jenkins case, and we'll see how that turns out. So A3 qualifies as a crime of violence? That's right.  So second-degree aggravated assault in Pennsylvania. And it's remarkable that I, as a federal prosecutor, am now so familiar with this, but this is because of the categorical approach. It's now A3 through A8, but subsection 8 was not added until, I think, 2014 or 2015. A1 and A2 are first-degree? A1 and A2 are first-degree. We're looking at A3 through A7, but no one's really arguing that A4 or A6 applies. So A4, there's a precedential decision of this Court in Ramos that says it does qualify. And that's, of course, very informative as to all the others, but we'll talk about that on Wednesday. So A4 qualifies, which is use of physical force with a deadly weapon. A3, A5, A6, we're going to be debating. Now we have A7 we have to talk about, and then one day we'll be talking about A8 as well, but it doesn't apply in this case because it wasn't in existence. Unless the Supreme Court puts us out of this categorical misery, but that's above our comprehension. Right, or Congress or the Sentencing Commission. There's always hope. In the end, what is your position with regard to Mr. Amos? With regard to Mr. Amos, he was convicted of second-degree aggravated assault. And what we see in the Shepard documents very clearly is it says F2. And with regard to the weapon? No, actually, so again, with the categorical approach, we're limited to the Shepard documents, and the Shepard documents do not include the actual police report summary, which tells us very clearly what happened, which is he kicked a prison guard. So if you ask me what was that, why did they charge him with F2 felony aggravated assault, it's A3. It's using physical force to knowingly cause bodily injury to an officer. That's why he was charged with it. It was A3. But we're limited to the Shepard documents, and the Shepard documents only tell us what he was charged with, which is A3 through A6, as second-degree. And so that's why we have to divide that. Hypothesizing he was a tear gas or a stun gun here. Right, which he wasn't charged with here. If he had been, I'd be more focused on that. Why are we talking about tear gas in the case that had nothing to do with tear gas? But again, he wasn't charged with A7. He kicked the prison guard, and he didn't kick the prison guard recklessly, but it's because of the categorical approach that we have to... That's where we are. All right, well, anything else? That's it. Again, I think that's a valid Terry search based on his flight, and he was properly sentenced. He did properly get the guideline of enhancement based on a crime of violence. All right. Thank you, Mr. Sellers. Maybe we'll hear from Ms. Horn on the public side. Thank you, Your Honor. Our argument with respect to the mens rea element of A7 is exceedingly textualist. The statute says, uses tear or noxious gas. Tear is defined as something that injures when dispersed in the atmosphere. Subsection A1, 2, 3, 4, and 5 of the same statute all say intentionally. If the General Assembly wanted to make this an intentional mens rea, they would have said intentionally uses, and they did not. But the word against is the focus here, and how against... With Borden, we understand that, and you suggest that it could be used against someone by throwing it against the wall, but we would say it's against the wall, not against the person. Your Honor, we could come up with many, many hypotheticals where someone throws it and isn't aware of the radius or wind comes up or they're recklessly carrying a protester or a Capitol rioter is holding tear gas recklessly. But Mr. Zelzmer's right. Criminal statutes normally say, uses the noxious gas and, as a result, causes injury to an officer. But this is using against. This is about assaulting officers. That's a different kind of provision than the other ones. And, you know, expressio unius, you seem to be suggesting that's what's doing the work here, but that's in the other ones it was necessary to spell out, or it's not so clear it was necessary to spell it out in this one. Well, I think Cabeda's full takedown of 302 is dispositive, and I think it's also an exceedingly anti-federalist position that the government is taking here when they're asking this court to narrow this offense that the General Assembly designed to protect police officers and other first responders from tear and noxious gas, which injures when being dispersed in the atmosphere. The jury instructions, while they're persuasive, this court relies on them. We gave the Quinones case as an example where this court cites the jury instructions for the elements of a state offense. Also, if you remember the plurality in Borden, they say that the word against takes its meaning from the verb phrase, uses physical force. And here we have a different verb phrase because we're talking about noxious gas, and we have a definition of noxious gas. This isn't a weapon that's aimed at somebody. This is something that injures when it's dispersed in the air, and that air happens to blow. Or an electron, like a stun gun or something like that. And a stun gun is normally used against someone, targeting somebody. Well, I think we can't read the noxious gas element out of it. And I think where we're here without Cabeda, we'd have to go back to the state cases like Mayfield and all the rest. But Cabeda has done the work for us already. This isn't unusual. And as the equal four votes in the dissent in Borden said, when there's an intentional or knowing mens rea, it's conventional to be explicit. And the General Assembly is explicit in many other subsections of the same exact statute. And so that's controlling here. When the General Assembly wants to require an intentional mens rea, they follow the convention and they're explicit. They don't hide it in two words that are buried in there. Notice there's an interesting difference none of you is focusing on. The others all start with attempts to cause. And we know from first-year criminal law, attempt is a specific intent crime. It already builds in that knowledge, et cetera, right? But this one just speaks of using tear or noxious gas or using an electric device against any officer. So it appears that, I mean, what inference should we draw from that, that the absence of intent means that there's a higher mens rea, that it's less protective of the officers than of the other people? I think what we should draw from that is that this subsection is silent as to mens rea, and the General Assembly intended to use the default mens rea, which applies any time the statute is silent, section 302. So what is it from your standpoint that we should do with Mr. Ames? Yes, well, we first think that the suppression motion should be reversed. In the alternative... The suppression motion? Yes. In the alternative... Suppression is for the handgun? Yes. What is your rationale for that? That he was seized without reasonable suspicion. And in the alternative, it should be... Can I go back for one moment? Yes, please. As I recall, he put his hand in his pocket, took it out, and the gun fell out? Is that correct? I'm not sure exactly of the facts after he fled. We don't argue that there was a lack of reasonable suspicion after the flight. The question is, when was the moment of seizure? And as to what we should do, the alternative is to remand for resentencing without the crime of violence enhancement. Without the crime of violence enhancement, referring to the weapon? Referring to the plus six enhancement to the firearm guideline. All right. Okay. Thank you. We thank both parties for a well-argued case. I would ask that we have a transcript prepared if we could ask the government to pick up the expense of that. Thank you.